FILED
2020 Nov-09  PM 03:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **GEORGE KEITH CLARK**  , ) | |
| ) | |
| **PLAINTIFF,** ) | |
| ) | |
| **v.** ) | **CASE NO.: 2:20-cv-00692-LSC** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **DEFENDANT.** ) | |

## FIRST AMENDED COMPLAINT

Comes Now the Plaintiff, George Keith Clark (hereinafter, "Mr. Clark"), to make and file this First Amended Complaint and to state the following:

## I. NATURE OF ACTION

1. This is an action against the United States of America (hereinafter, the "Defendant") under the Federal Tort Claims Act (28  U.S.C. § 2671, *et seq.)* and 38 U.S.C. § 7316 for negligence, assault, battery, and the intentional infliction of emotional distress in connection with medical care provided to Mr. Clark by the U.S. Department of Veterans' Affairs (hereinafter, "VA") at the Birmingham VA Medical Center. More specifically, the claims arise from inappropriate and injurious care given to Mr. Clark by a a male nurse working the night shift in the Cardiovascular Intensive Care Unit (CVICU) at said VA

1

facility at the same time Mr. Clark was in said Unit recovering from triple-by-pass open-heart surgery.

## II. PARTIES

2. Mr. Clark is, and at all times relevant hereto was, a citizen and resident of the State of Alabama over the age of 21. Mr. Clark is, and was at the time, a disabled veteran who since 2009 has received his medical care from or through the VA.

3. Defendant United States of America is the sovereign nation that, through its agency the VA, operates  the Birmingham VA Medical Center in Birmingham, Alabama. Defendant is also the entity responsible for the legal consequences of the operation of said VA facility.

## III. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this case arises under 28 U.S.C. § 1346(b) of  the Federal Tort Claims Act and 38 U.S.C. § 7316 in that this Court has original jurisdiction over all claims against the United States of America.

5. Mr. Clark has complied with all administrative prerequisites to the institution of this suit. The dates on which the injuries occurred were January 23-26, 2017. Mr. Clark filed a proper and complete written administrative claim with the appropriate VA office on July 13, 2018.  His claim was denied  on November 21, 2019 (see reference code "GCL 381746").

6. The male nurse who injured Mr. Clark was, at the time of the incidents, an employee

2

of the VA acting within the scope of his employment. If the Defendant were a private person, it would be liable to Mr. Clark under Alabama law for the tortious conduct set out herein.

7. Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1402(b) in that all of the acts or omissions forming the basis of these claims occurred in said District.

## IV. GENERAL FACTS

8. On January 23, 2017, Mr. Clark had triple bypass, open-heart surgery at the VA hospital in Birmingham, AL. The surgery was preformed by the visiting Chief Surgeon from the University of Alabama Birmingham and apparently went well. After the surgery, Mr. Clark was put in the VA's CVICU for several days. Mr. Clark was in the CVICU for a prolonged period because he had some fluid on his lungs and had low oxygen levels. Consequently, the breathing tube that had been inserted into his mouth and down his throat during surgery (i.e., the intubation) remained in place for two days rather than for the few hours after surgery that is usually the case.

9. This tube was securely taped to Mr. Clark's face so that it could not be moved or readily removed. The tube was so large that it was nearly impossible for Mr. Clark to talk and difficult for him to swallow. This tube was extremely uncomfortable and caused his throat to become raw and irritated. This was made worse by the fact that he was not allowed to have water until about the same time the breathing tube was eventually

removed. The tube was also causing Mr. Clark to frequently gag and to experience deep, painful coughs. Unfortunately, the staff could not remove the tube for fear of further complications.

10. During the open-heart surgery, Mr. Clark's sternum was cut in half and then wired back together after the surgery was completed. This was extremely painful and caused Mr. Clark to be very weak and fragile. Immediately following the surgery Mr. Clark was warned repeatedly by his surgeon, by the surgeon's nurse practitioner, by other doctors involved with his operation, and by the hospital nurses attending to him not to move too much or try to contract his arm muscles too tightly because to do so could pull the wired sternum apart causing great damage and the need for additional surgery.

11.  In order to prevent him from pulling his sternum apart and to keep him from removing his breathing tube, Mr. Clark was tied down to the hospital bed after surgery. Consequently, Mr. Clark's hands and feet were tied to the bed at four restraint points for two days. He also had a tube inserted into his nose and several tubes sewn into or otherwise implanted into his chest and an IV and other tubes in his arms. In other words, he was almost completely immobile.

12. While restrained in this fashion, Mr. Clark's mobility was limited to wagging his fingers and toes and nodding his head.

13. While restrained in the fashion and for some time afterwards, Mr. Clark was also sedated.

4

14. At the time of the open-heart surgery, Mr. Clark was a 63-year-old disabled veteran who has been receiving medical care from the VA since at least 2009 and who had limited mobility and had to use a cane or walker to move around. He suffered from a variety of painful and/or debilitating conditions including, but not limited to, the following: Crohn's disease, colon and rectal cancer, osteonecrosis of the left hip, lumbar spine disease and sciatica, cardiovascular disease, diabetes, gout, and peripheral neuropathy. He also had his colon removed and a permanent stoma created in 2010, which herniated soon after it was put in and which had not been repaired at the time of the surgery. He also had very painful, ongoing, unrelenting, deep, open weeping lesions around the herniated stoma resulting from a rare and intractable condition known as peristomal pyoderma gangrenosum. As a result of one or more of those medical conditions, Mr. Clark had severe but intermittent pain in his fingers, wrists, toes, and ankles, and more constant pain in his elbows at the time of surgery. He also had severe pain running from his lower back through his left hip to his left knee as a result of his lumbar spine disease and/or the osteonecrosis of his left hip. That made it impossible for him to move or lift his left leg while lying down. It also made it impossible for him to straighten that leg. Lying in bed was a miserable experience for him. He also has plates and pins and/or screws in his right ankle from an old surgery that repaired several breaks in that ankle. The condition of his right ankle still causes him ongoing pain and did so at the time of the open-heart surgery. Mr. Clark also had moderately severe, intermittent

pain in his neck at that time.

15. Although it was extremely painful for Mr. Clark to cough after his surgery, his doctors and nurses encouraged him to cough as much as possible to help expel the excess fluid in his lungs. When Mr. Clark coughed, he would usually bring up some of that fluid or phlegm, but it would remain in his mouth or throat. He was not supposed to re-swallow this so the nursing staff would insert a long narrow tube into his mouth (that is, they would insert it down along side the breathing tube that was already there) to suction out this material. The daytime staff almost always noticed when he was coughing loudly or harshly and would ask him on those occasions if he needed the suction tube. If they failed to ask or notice, he would wiggle his fingers or wag his toes or make what sound he could (he could not talk), and they would come over and ask what he needed. Mr. Clark was told by the daytime staff to ask for this suction tube whenever it was needed.

16. In contrast to the other nurses, one nurse on the night shift would often ignore Mr. Clark even when Mr. Clark had a loud, violent coughing spell and coughed up phlegm. Mr. Clark believes, but is not certain, that said nurse's first name is Mark (hereinafter, the "Nurse"). When Mr. Clark tried to get the  Nurse's attention, the Nurse would immediately become agitated and often angry as well. As a result of the Nurse's neglect, Mr. Clark would often wind up choking and re-swallowing the phlegm that had already been coughed up. This caused a great deal of pain to his newly severed sternum.

6

17. In addition to coughing up phlegm, Mr. Clark also experienced almost constant itching all over his body while in the CVICU. It was nearly unbearable to have this problem while he was tied to a bed and unable to scratch and while intubated and unable to speak. Mr. Clark had to rely entirely on the nursing staff for relief. When Mr. Clark got the attention of other nurses on other shifts they would ask what he wanted. Because Mr. Clark's speech could not be readily understood, they would ask him a series of questions about what he wanted until they hit on the right item, and Mr. Clark nodded up and down. Mr. Clark also eventually made those nurses understand that he occasionally wanted to write something down. The other nurses would bring a pen and put it in Mr. Clark's hand, which was still tied to the bed, and then hold a pad next to Mr. Clark's hand. This way Mr. Clark could write a word or two thereby helping him communicate.

18. In contrast to the other nurses, the Nurse automatically assumed that whenever Mr. Clark tried to get his attention it was because Mr. Clark wanted water, which Mr. Clark was not supposed to have, or because he (Mr. Clark) wanted to have the tube in his throat removed or to be released from his restraints. That is, the Nurse automatically assumed that Mr. Clark was merely being a nuisance whenever he requested help. That assumption was incorrect. Nonetheless, whenever Mr. Clark requested help from the Nurse, said Nurse, during and in the course of his immediate and ongoing response to Mr. Clark's request for help, would take inappropriate and/or incorrect action against Mr. Clark in order to stop Mr. Clark from acting in a manner the Nurse perceived to be

inappropriate. The Nurse's incorrect, improper responses to Mr. Clark's requests for help resulted in physical, sexual, and emotional injury and ongoing intimidation.

19. Because he was tied to a bed and intubated, Mr. Clark's only means of getting the Nurse's attention was to wag his hands and feet or to try to make a sound if the Nurse was close enough. Although the Nurse often ignored Mr. Clark's efforts to get his attention, he did occasionally respond to the hand and foot wagging. At first, the Nurse would come to the right side of Mr. Clark's bed, and when he did, he was always visibly agitated and very short with Mr. Clark.

20. Although Mr. Clark tried to speak as clearly as possible, the Nurse never understood him. The Nurse would demand that Mr. Clark speak more clearly. Although Mr. Clark tried, he couldn't make the Nurse understand, which caused the Nurse to become even more agitated. After Mr. Clark made two or three attempts to speak, the Nurse would grab Mr. Clark's right hand and bend his fingers backwards in an extreme and contorted fashion. This was extremely painful and Mr. Clark feared that the Nurse was psychotic and was going to break his fingers. The Nurse kept Mr. Clark's fingers in this painful position for at least a couple of minutes during and in the course of each of his responses to Mr. Clark's request for help. At the same time, the Nurse would put his face next to Mr. Clark's face and angrily tell Mr. Clark to either "learn to talk" or "shut up".

21. The Nurse had a female student nurse with him during the first night Mr. Clark was in the CVICU. Sometimes the student nurse came with the Nurse to Mr. Clark's bed and

witnessed the Nurse's treatment of Mr. Clark. She never objected to or seemed disturbed by this. The Nurse violently contorted Mr. Clark's fingers and angrily insulted him at least four or five more times while he (the Nurse) was in the course of responding to Mr. Clark's requests for help (i.e., help with the phlegm in Mr. Clark's mouth or the itching he experienced on that first night he was in the CVICU). There were additional incidents of the same type under the same circumstances on the second night Mr. Clark was in the CVICU. Each time the student nurse happened to be present, Mr. Clark hoped she would stop the improper treatment, but she never did. She just stood by and watched. By then, Mr. Clark felt very helpless and was very afraid for his safety.

22. After a while, the Nurse changed his behavior slightly by going after Mr. Clark's feet rather than his hands. As the Nurse was passing by the foot of Mr. Clark's bed on one occasion, Mr. Clark wagged his feet back and forth to get his attention because he (Mr. Clark) had just had an extremely rough coughing spell and needed help with a great deal of fluid and phlegm in his mouth and throat (by this time Mr. Clark did not call the Nurse unless he absolutely had to). The Nurse stopped at the foot of Mr. Clark's bed and without ever asking what the problem was, just assumed Mr. Clark wanted water. The Nurse instantly became loud, angry, and menacing. Mr. Clark tried to indicate that he did not want water but the Nurse just ignored him. The Nurse then started threatening Mr. Clark with serious physical harm.

23. The Nurse stated that he would teach Mr. Clark a lesson for requesting water he was

not supposed to have. The Nurse then grabbed Mr. Clark's toes and forced them backwards and contorted them until Mr. Clark was in extreme pain[1] and emotional distress. Simultaneously, the Nurse told Mr. Clark that as punishment for requesting water he was not supposed to have, the Nurse was going to force water down Mr. Clark's throat until Mr. Clark coughed, choked, and wretched so violently he pulled his sternum apart. The Nurse then threatened, as part of the punishment for misbehavior, to jump on top of Mr. Clark and put his knee on Mr. Clark's sternum. Due to the Nurse's previous behavior, Mr. Clark took these threats seriously. Due to being tied down with a severed sternum, Mr. Clark was afraid of the Nurse by this time, which was very humiliating to Mr. Clark.

24. On another occasion, the Nurse came to Mr. Clark's bed to monitor Mr. Clark's condition (he was checking the saline solution or some vital sign). While there, he started saying bizarre things over and over such as, "So, you think you're a tough guy" and  "So, you think you are tougher than me." Then he said, "Are you planning to take me on?" and "I'll take you on and tear you in half."  It was very frightening.

25.  As the Nurse was moving around Mr. Clark's bed to monitor medical devices or to respond to Mr. Clark's request for help, he was also inflicting pain on Mr. Clark by wrenching and contorting his toes backwards. While Mr. Clark was tied down in the CVICU with a severed sternum, the Nurse engaged in this violent conduct

---

1  Mr. Clark was already suffering from significant pain in his toes from other medical conditions.

approximately a dozen times. The Nurse also continued to make insulting remarks and/or similar kinds of threats each time. Each of these incidents occurred during the course of the Nurse's specific response to a request for help of some kind from Mr. Clark or during the course of some monitoring regimen or custodial care the Nurse had to carry out as part of his duties.

26. During the second night Mr. Clark was in the CVICU, VA personnel used the closed circuit TV in the CVICU to monitor the activity there for a very brief period. This was some time well after the night shift began.  At the time of the TV monitoring, the Nurse and the female student were engaged in sexual activity with each other so they did not notice that they were being observed. A few minutes later several VA employees came to the CVICU and took the Nurse and the female student away. Another nurse named Tippet took their place. Sometime later the Nurse showed up again without the student nurse and finished out his shift with Tippet.

27. An African-American man who had open-heart surgery was brought into the CVICU on the second day Mr. Clark was there.  The African-American man apparently had mental issues causing him to be disoriented and frightened. As a result, he was very loud at times, and once the Nurse started his shift, he treated the African-American man in an injurious manner in much the same way he treated Mr. Clark for somewhat similar reasons.

28. On or about the third evening Mr. Clark was in the CVICU, the Nurse and Tippet

11

told Mr. Clark he had to have a bath. Mr. Clark needed a bath but was unable to bathe himself. Nonetheless, he did not want to be given a bath by the Nurse considering the Nurse's past behavior. The Nurse and Tippet insisted that Mr. Clark had to bathe or be bathed every evening and that the night shift was responsible for giving the bath; consequently, they forcibly bathed him. At that time, Mr. Clark was virtually limp from the waist up. To get him into a sitting position, he had to be pulled upright and then supported in order to stay in position. Consequently, the Nurse and Tippet positioned themselves on either side of Mr. Clark and sat him upright. Then, they each put one arm across Mr. Clark's back  and placed his arms to the rear. That is, Mr. Clark's arms were moved out of the way and to the rear and were effectively pinned there.

29. During the bath, the Nurse started washing Mr. Clark's genitals. Mr. Clark had never had a nurse bathe his genitals before and was unsure about how it was supposed to be done.  After about two or three minutes, Mr. Clark felt very awkward, confused, and embarrassed. He didn't know whether he should question this or whether it was normal. Furthermore, he was terrified of confronting the Nurse. Additionally, Tippet didn't say anything or object. The Nurse continued manipulating his genitals for at least another two or three minutes during which time Mr. Clark became increasingly alarmed and horrified and realized that the Nurse was receiving personal sexual gratification  from bathing him. Mr. Clark tried to object by saying, "the bath is over" and "that's enough, that's enough," but he was otherwise helpless given that his arms were pinned back and

12

given that he could not even sit up without help. Despite Mr. Clark's objection, the Nurse continued handling his genitals and started moving his hand rapidly up and down along the shaft of Mr. Clark's penis in an apparent attempt to have him ejaculate. Mr. Clark objected repeatedly by saying, "the bath is over, the bath is over" and "we're done" but the Nurse continued for an additional period. Tippet was watching the entire time. Mr. Clark was completely humiliated and shamed by this experience.

30. Mr. Clark was intimidated by the Nurse and afraid of probable retaliation after spending just one shift with him. Despite his well-founded fear, Mr. Clark told one of the day shift nurses that the Nurse was behaving unprofessionally, erratically, irrationally, and in an intimidating manner. Mr. Clark also made a similar comment to another day shift nurse the next day. These two nurses responded in a fashion that seemed to indicate the Nurse's behavior towards Mr. Clark was not unexpected or was consistent with what they knew of his past behavior. They did nothing else in response to Mr. Clark's statements.

31. Additionally, on two or three occasions while he was in the CVICU, Mr. Clark alerted Richard Byers to the problem. Richard Byers was an assistant to Dr. Holman: the surgeon who performed the by-pass operation. Mr. Clark told Byers that the night-shift nurses were not acting right or professionally or safely or in the interests of the patients, that he (Mr. Clark) was having a serious problem with the nurses, that he was alarmed and very worried about it, and that someone should do something about it. Mr. Byers

wanted more specifics, but Mr. Clark was afraid to be more specific. Byers said he could do nothing about it except report it to Nurse Charly Murphree, RN, who was the Nurse Manager and/or Charge Nurse for the CVICU and the SCU. Mr. Byers did, in fact, report the problem to Nurse Murphree on at least two occasions.

32. As a result of Mr. Byers reports, Nurse Murphee came to see Mr. Clark twice. The first occasion was on the day after Mr. Clark's first night in the CVICU. On both occasions Nurse Murphee came to talk to him, Mr. Clark told her he was having a serious problem with one of the night-shift nurses and that he was alarmed and very worried about it. He also told her he felt very intimidated about the situation and feared reprisal, and, therefore, he could give her no more specifics until he was moved out of the CVICU.

33. Mr. Clark insisted on leaving the hospital ahead of schedule because of the incidents with the Nurse.

34. During the time Mr. Clark was in the CVICU, the Nurse repeatedly met with small groups of females (other nurses or other VA employees working in the vicinity of the CVICU) just outside the door to the CVICU. These gatherings were held in plain sight, were noisy and lengthy. During the course of these gatherings the Nurse invariably touched one or more of the females in a very casual and/or flirtatious and/or sexually tinged manner.

35. There were no security personnel inside or in the vicinity of the CVICU during the

time Mr. Clark was in the CVICU. During the time Mr. Clark was in the CVICU, no precautionary measures were being implemented to control ingress to the CVICU or to the hospital generally.

36. No supervisory personnel were stationed inside the CVICU during the time Mr. Clark was in the CVICU. Supervisory personnel (aside from treating physicians) did not visit the CVICU at any predetermined intervals during the time Mr. Clark was in the CVICU and did not visit the CVICU at all except for two occasions after being alerted to a problem.

37. The closed circuit security television in the CVICU was used only once for a short time while Mr. Clark was in the CVICU.

38. Mr. Clark suffered severe emotional distress, humiliation, and physical pain as a result of the improper behavior directed at him by the Nurse as set out hereinabove.

## COUNT I
## NEGLIGENCE

39. Mr. Clark hereby re-alleges, affirms, and adopts by reference as if fully set out in this Count paragraphs 1-38 hereinabove.

40. Because Mr. Clark's sternum was cut in half, because his hands and feet were tied to his hospital bed at four restraint points, because he had tubes sewn into his chest, because he was intubated and sedated while in the VA's CVICU, and because he had no control over ingress into the CVICU, he was dependent on the VA for protection from

the criminal and/or tortious acts of third persons. Those circumstances and that dependency gave rise to a special relationship[2] between Mr. Clark and the VA.

41. The risk of harm and injury to Mr. Clark resulting from the criminal and/or tortious behavior of a third person during this special relationship was the type of general risk that was foreseeable given the particular circumstances of Mr. Clark's hospitalization, restraint, and sedation in the CVICU. That is, at the time the VA restrained and sedated Mr. Clark while he was simultaneously intubated and surgically impaired, the VA realized or should have realized the likelihood that a general risk of harm would be created and that a third person might avail himself of the opportunity to commit torts such as battery, especially given that any employee, and most any patient or visitor, had access to the CVICU at most any time[3].

42. Under these circumstances, the VA had a had a non-discretionary duty to guard and protect Plaintiff against the intentional torts and/or criminal acts of third persons. This included, but was not necessarily limited to, taking precautionary steps that were reasonable in the face of the foreseeable harm.

43. Upon catching the Nurse engaged in sexual behavior with the student nurse and upon receiving complaints from Mr. Clark about the Nurse's improper behavior, the VA had actual knowledge of the dangerous situation and safety risks created by having the

---

2  The VA indirectly acknowledged this by placing Mr. Clark in the CVICU. A unit for patients who need full-time nursing care.

3  There was a cold-water dispenser in the CVICU, and all manner of people came in and out of the Unit at all times to get the cold water.

Nurse work in the CVICU.

44. Under the circumstances, the VA negligently breached its duty to Mr. Clark by not taking any reasonable and/or meaningful measures to guard or protect Mr. Clark from the intentional torts and/or criminal acts of third persons.

45. The VA's negligence was the proximate cause of Mr. Clark's injuries. That is, the VA had the ability to comply with and carry out its duty, but it did not do so. The VA's duty was not vague. Mr. Clark had no ability to protect himself, and the VA's conduct created the risk of the very kind of harm to which Mr. Clark was ultimately subjected.

46. Mr. Clark suffered severe emotional distress, humiliation, and physical pain as a result of the VA's negligence.

## **COUNT II**

### **ASSUALT**

46. Mr. Clark hereby re-alleges, affirms, and adopts by reference as if fully set out in this Count paragraphs 1-34 & 38 hereinabove.

47.  By threatening to force water down Mr. Clark's throat until Mr. Clark coughed, choked, and wretched so violently he pulled his sternum apart and by threatening to jump on top of Mr. Clark and put his knee on Mr. Clark's sternum and by threatening to tear Mr. Clark in half on multiple occasions, the Nurse made an intentional offer to touch Mr. Clark's person in a rude or angry manner.

48. Because Mr. Clark had a sternum that had been cut in half, because he was restrained

at four points, because he was intubated, because he had tubes implanted in his chest, because he was sedated, and because the Nurse had battered him on previous occasions, the threats from the Nurse were made under circumstances that created a well-founded fear in Mr. Clark's mind that another battery was imminent.

49. Because the Nurse had committed previous batteries on Mr. Clark, because the student nurse had not tried to stop those earlier batteries, and because the Nurse had committed similar batteries on the African-American man in the CVICU with Mr. Clark, the Nurse had the apparent present ability to effectuate his threats of battery.

50. Mr. Clark suffered severe emotional distress as a result of these assaults.

<u>**COUNT III**</u>

**BATTERY**

51. Mr. Clark hereby re-alleges, affirms, and adopts by reference as if fully set out in this Count paragraphs 1-34 & 38 hereinabove.

52. By intentionally, hostilely, offensively, angrily, vengefully, and harmfully contorting Mr. Clark's fingers and toes on multiple occasions over multiple days while he was in the CVICU, the Nurse committed multiple batteries on Mr. Clark.

53. By intentionally, hostilely, offensively, rudely, insolently, and vengefully touching and inappropriately manipulating Mr. Clark's genitals while Mr. Clark was helpless, the Nurse committed a  battery on Mr. Clark.

54. Mr. Clark suffered severe emotional distress, humiliation, and physical pain over a

prolonged period as a result of these batteries.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

55. Mr. Clark hereby re-alleges, affirms, and adopts by reference as if fully set out in this Count paragraphs 1-34 & 38 hereinabove.

56. By threatening to force water down Mr. Clark's throat until he coughed, choked, and wretched so violently he pulled his sternum apart and by threatening to jump on top of Mr. Clark and put his knee on Mr. Clark's sternum in order to break it and by threatening to tear Mr. Clark in half on multiple occasions and by doing all these things at a time when Mr. Clark was restrained, sedated, intubated, and had his sternum cut in two, the Nurse engaged in intentional and/or reckless conduct of an extreme and outrageous nature that was meant to cause severe emotional distress and which did cause emotional distress so severe that no reasonable person could be expected to endure it and so extreme in degree as to go beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in civilized society.

57. By battering Mr. Clark on multiple occasions over a multi-day period by contorting his fingers and toes in an extremely painful manner while insulting and/or threatening him, and by doing all these things at a time when Mr. Clark was restrained, sedated, intubated, and had his sternum cut in two, the Nurse engaged in intentional and/or reckless conduct of an extreme and outrageous nature that was meant to cause severe

emotional distress and which did cause emotional distress so severe that no reasonable person could be expected to endure it and so extreme in degree as to go beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in civilized society.

58. By intentionally, hostilely, offensively, rudely, insolently, and vengefully touching and inappropriately manipulating Mr. Clark's genitals while bathing Mr. Clark, and by doing this at a time when Mr. Clark was restrained, sedated, intubated, and had his sternum cut in two, the Nurse engaged in intentional and/or reckless conduct of an extreme and outrageous nature that was meant to cause severe emotional distress and which did cause emotional distress so severe that no reasonable person could be expected to endure it and so extreme in degree as to go beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in civilized society.

59. By doing all these things in connection with each other at a time when Mr. Clark was restrained, sedated, intubated, and had his sternum cut in two, the Nurse engaged in intentional and/or reckless conduct of an extreme and outrageous nature that was meant to cause severe emotional distress and which did cause emotional distress so severe that no reasonable person could be expected to endure it and so extreme in degree as to go beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in civilized society.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Mr. Clark demands judgment against the Defendant for damages in the amount of $12,500,000.00 for the tortious conduct set out hereinabove. Mr. Clark also requests post-judgment interest as provided by law, the costs of this proceeding, and all such other, further relief to which he is justly entitled under the facts, circumstances, and law of this case.

Done on this the 9th day of November 2020.

Respectfully submitted,

/s/ G. Keith Clark
G. Keith Clark
Plaintiff
12060 County Line Road
Suite J - 185
Madison, AL 35756
phone: 256-260-9292
fax: 855-511-3192

## Certificate of Service

I, G. Keith Clark, hereby certify on this the 9th day of November, 2020, that I have served all parties to this action a copy of the foregoing First Amended Complaint by filing a copy of the same with the Court's CM/ECF system, which will provide copies to

the following:

Jack Hood
Assistant U.S. Attorney
U.S. Attorney's Office
1801 Fourth Avenue North
Birmingham, Al 35203
205-244-2001
205-244-2181 (fax)
jack.hood@usdoj.gov


/s/ G. Keith Clark